No. 3320

Second Circuit

VICTORY GRAVEL CO., INC., v. DYER

(May 20, 1931. Opinion and Decree.)
(July 14, 1931. Rehearing Refused.)

Barksdale, Bullock, Warren, Clark & Van Hook, of Shreveport, attorneys for plaintiff, appellant.

Melvin F. Johnson, of Shreveport, attorney for defendant, appellee.

McGREGOR, J. This is a suit brought by the plaintiff, Victory Gravel Company, Incorporated, against the defendant, F. L. Dyer, for the sum of $774 alleged to be due for building material consisting of washed gravel sold and delivered to the defendant, and by him actually used in the construction of certain houses which he was building in the city of Shreveport, between the dates of September 18, 1923, and February 29, 1924. It is alleged that in the matter of the purchase of the said material by the said F. L. Dyer he was represented by his agent, one J. L. White, operating under the name of J. L. White, trustee. The contention of the plaintiff in this suit is that J. L. White was building houses for Dyer, and that in all transactions relative to the said building operations during that particular period he styled himself J. L. White, trustee, and that all business of every kind transacted in the name of J. L. White, trustee, was for the use and benefit of Dyer, and that all debts so contracted were Dyer's debts and not White's. In the alternative, the plaintiff alleged as follows:

"But if the court should find that the business conducted in the name of J. L. White, Trustee, was not owned and operated individually by defendant, then and in that event, in the alternative, petitioner shows that said business was a partnership composed of this defendant and J. L. White, and that the business of said partnership was to construct homes on lots owned by defendant and to sell the same, dividing the net profits equally between them."

It was further alleged that, if the court should find that this business conducted as was alleged was a partnership, then the said J. L. White was in active charge of the construction of the homes for the partnership, purchasing for its account the material sued for. In his answer the defendant simply denied every allegation of the

plaintiff's petition, and asked that the demand be rejected. On these issues the case was tried, and there was judgment in favor of the defendant, rejecting the plaintiff's demand. From that judgment the plaintiff is prosecuting this appeal.

J. L. White testified in effect that he and F. D. Dyer, during the winter of 1922 and 1923, entered into an agreement whereby they were to build a number of houses, that he (White) was to superintend the building operations and furnish one-fourth of the money required, and that Dyer was to furnish three-fourths of the money, and, in addition thereto, all of the lots on which the homes were to be built. He testifies that under this agreement the houses were to be sold, and that out of the profits realized, if any, Dyer was to receive the first $750 of profit, that he, White, was to receive the next $750 of profit, if realized, and that, if there should be any profit in excess of $1,500, it was to be divided equally. Up to this point this part of White's testimony is corroborated partly by Dyer, who says that there was such a building agreement, but that he was to receive a profit of $1,000 per house, and that this agreement applied to only four houses. He agrees also with White's statement that each one was to furnish a portion of the money required to carry on the business. They each then agreed that for some reason or other there was a change in their agreement during the fall of 1923. White says that he was no longer able to furnish any portion of the money for the building operations, and that it became necessary for Dyer to advance it all. He testifies further that, since Dyer was to furnish the money, he was to receive the first $1,000 of the profit made on each house instead of $750, as formerly. Dyer flatly denies this statement, and says that under the new agreement a fixed contract price was agreed upon for each house in advance, and that these prices ranged from $4,000 to $6,000 per house. He says no written contracts were executed to cover any of the houses, and he is unable to tell the price of any particular house. No bond was required in any case. It is admitted by both Dyer and White that, in the beginning of their operations, whatever money was furnished by Dyer was paid to White and disbursed by him.

White further testifies, that, after the new arrangement was made, Dyer never advanced him any money at all for operations, but that he (White) bought and contracted for all materials in the name of J. L. White, trustee, with the understanding that he was acting for Dyer, who was to pay all bills. Under the first arrangement, it seems that all materials used by him were charged to him personally, and he paid the bills out of funds furnished by both and deposited to his personal account. He testifies that at the beginning of the new arrangement he went in person to all the materialmen, including the plaintiff, Victory Gravel Company, Incorporated, and closed his personal accounts and opened up new ones in the name of J. L. White, trustee, for the benefit of Dyer. The account sued on is styled thus, and it is in evidence that the plaintiff sold the material with the understanding that it was being furnished to Dyer.

Mr. Dyer denies all this, and to corroborate his testimony offered in evidence checks amounting to $57,500 paid to White individually after the date of the so-called new agreement, but White testifies that all this money was paid to him to settle the outstanding bills that had been incurred under the first arrangement, and in this statement we think he is correct. He states positively that, after the new arrangement, Dyer furnished all the money,

and, in order to satisfy himself that it went into the buildings, he paid all bills direct, furnished all pay roll money, and disbursed it weekly through his own office by his own bookkeeper and employees. He says all bills for materials were mailed to him (J. L. White), and that he immediately approved them and passed them on to Dyer's office and never heard of them afterwards. In this statement he is corroborated by the record. There is no doubt about White's operating from some time in the fall of 1923 up to February 22, 1924, under the name of J. L. White, trustee. This is substantiated by the record. It is also in evidence that there was never a bank account in the name of J. L. White, trustee, until after February 22, 1924, when, pursuant to an agreement of that date, such an account was opened by funds deposited by Dyer alone. If White had been paying the bills up to that time and during the period that he was operating and buying materials in the name of J. L. White, trustee, there would have been a bank account in this same name under which he was operating. If White had been operating under the name of J. L. White, trustee, as a contractor for a stipulated price per house, he most certainly would have kept books on each separate house in his own office. He would not have left all the bookkeeping on each house and on all the work to be taken care of by the owner for whom he was building. He swears positively that, after the new arrangement, he never received or disbursed a dime on the new work for labor or material, that Dyer took care of the pay roll each week with his own office force, and that he presumed that he was taking care of the bills for materials in the same way. He testifies that, when he and Dyer came to make a compromise settlement, he had no way of knowing what bills were unpaid, except through the approved bills which he had sent to Dyer's office. If any bill which he remembered had been incurred was not produced in this settlement by Dyer or his bookkeeper, he naturally presumed that it had been paid by Dyer under their agreement. He states further that the said compromise agreement was based solely upon a list of bills and invoices found in Dyer's office which had been sent in with his (White's) approval.

This testimony of White's is contradicted by Dyer in nearly every instance. It is a close question to decide as to which testimony is correct. It is evident that they were not in perfect agreement, for, if they had been, there could not be such a wide divergence between their respective testimony as to the plan under which they were conducting these building operations. But this failure on their part to be in perfect accord as to the plan of their operations does not necessarily defeat the claims of those who furnished the materials that went into the houses that were built. White did go to each furnisher of materials and impart the information that from that time on he was buying materials in the name of J. L. White, trustee. Plaintiff's new account with White was opened in the name of "J. L. White, Trustee," and it is on that account that this suit is based.

All bills for materials were uniformly approved and passed on to Dyer's office by White. No objection was ever raised to the procedure. So it is apparent that Dyer knew that the various furnishers of materials were selling their goods to J. L. White, trustee, for his buildings under the impression that he (Dyer) was responsible in some degree for them. If Dyer was aware of this line of conduct on the part

of White, and did nothing to correct it, he cannot escape the liability that the law imposes.

The fact that Dyer disbursed all funds, and even had his own office force make up the pay roll and had them go to the scene of work each week and see, all the labor, shows that White had little, if anything, to do with the business management of the building operations. Dyer had come to the point where he wanted to know where his money was going, and he adopted this method of doing it. For all intents and purposes, Dyer, through his office force, had the entire management of the business of the building operations. All that White did was to superintend the labor with the hope of getting a part of the profits for his compensation.

Under the testimony, White was operating either as a partner of Dyer or as a contractor. No satisfactory proof has been offered to show that he was a contractor, so he must have been a member of a partnership with Dyer, as his partner furnishing all the money and disbursing it. At the time that this suit was filed, this partnership had been dissolved, and its affairs at least partially liquidated.

A case very similar to this one was before this court once before—Shreveport Long Leaf Lumber Company v. White et al., 10 La. App. 273, 120 So. 694. The same attorneys represented the plaintiff in that case that represent this plaintiff. The defendants were J. L. White and F. L. Dyer, sued as commercial partners. The obligation on which the suit was based arose during the same period as the one in the present case arose. The lower court found the defendants, J. L. White and F. L. Dyer, to be an ordinary partnership, and rendered judgment against them jointly. The testimony in the case was confusing and conflicting, as it is in the present case. But this court approved the finding of the lower court, and affirmed the judgment. The entire record in that case was made a part of the case at bar. Reading the two records together, we have arrived at the conclusion that, after the termination of the first agreement, which evidently was a partnership, Dyer assumed full control of the business of the building operations, and White was reduced to the position of a partner furnishing his labor with his compensation dependent upon any profits that he might make for the partnership.

Not only did the first partnership fail, but the new arrangement was evidently unsatisfactory. So, in the latter part of February, 1924, White and Dyer endeavored to compromise their differences and signed a written settlement of all their affairs. In that settlement, it was agreed that there were outstanding bills due on account of the building operations amounting to about $26,000. To liquidate these bills, Dyer agreed to deposit $16,000 cash to the credit of J. L. White, trustee, checks on which were to be issued from, and controlled by, Dyer's office. To pay the remaining $10,000 or more, a certain piece of property was to be sold, and, if there was anything left over, it was to belong to White, and, if this cash and property proved to be sufficient to pay off the indebtedness, White was to receive a deed to another piece of property in addition to what he may have received from the purchase price of the first piece of property. Attached to this compromise agreement was a list of claims said to be due by J. L. White amounting to $26,057.03, and including the claim of the plaintiff. It is contended that this document shows that White owes the plaintiff, instead of the defendant owing him. This might be true as

between White and Dyer after the signing of the document, but creditors who had furnished materials for Dyer's buildings under the justifiable belief that Dyer and White were partners, and that Dyer at least as a partner was responsible, cannot be prejudiced by a technical construction of any subsequent compromise agreement signed by Dyer and White. It is significant that Dyer's bookkeeper issued all checks against this fund of J. L. White, trustee. Among the checks so issued was one payable to plaintiff for $500, as a part payment of the account sued on. Dyer lacked $1,800 of depositing the $16,000 agreed upon, and, as a result of his failure to so deposit the amount agreed upon, this $500 check was never paid.

Counsel for defendant earnestly argues that, even though Dyer might be responsible in some degree for all debts contracted in the name of J. L. White, trustee, the amount sued on, being over $500, has not been proved in accordance with the provisions of article 2277, Civil Code. We take it that the testimony of J. E. Morgan, agent of the plaintiff, and of J. L. White, taken together, is ample proof of the correctness of the account. Counsel also urges three years' prescription against all items on the said account that were three years old at the time of the filing of this suit. This plea would be good against those items, if the $500 check had not been drawn and issued by Dyer's office on March 11, 1924, pursuant to the compromise agreement between Dyer and White. Whether or not the issuing of this check in this manner can be construed to be an acknowledgment that Dyer himself owes the plaintiff, it certainly was a written acknowledgment on Dyer's part of the correctness of the bill at that time, and therefore interrupted prescription on the account.

For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be, and the same is hereby, annulled and reversed, and that there now be judgment herein in favor of the plaintiff, Victory Gravel Company, Incorporated, against the defendant, F. L. Dyer, for the sum of $387, with 5 per cent interest from February 29, 1924, until paid, the defendant to pay all the costs of both courts.